UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

HEIDI J. INGRAO and BRADLEY B. INGRAO,
as Parents and Natural Guardians of RBI, an infant,

                                                **Plaintiffs,**

- against -                                                                                                1:04-CV-769

CLAUDETTE M. GROSSI, JANET LYNCH, MARGARET
FLYNN, TERESA M. FITZPATRICK, ANDREA BURGER,
BARBARA M. LYNCH, JO HEPINSTALL, WILLIAM L.
AUSTIN, ROBERT REIDY, and ROSEMARY BROWN, all
in their Individual Capacities.
                                                    **Defendants.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**


**DECISION & ORDER**

**I. INTRODUCTION**

      Plaintiffs Heidi J. Ingrao and Bradley B. Ingrao, the adoptive parents of RBI, commenced this action asserting individual capacity claims against employees of the Albany County Department of Social Services (Claudette M. Grossi, Janet Lynch, Margaret Flynn, Teresa M. Fitzpatrick, Andrea Burger, Barbara M. Lynch and Jo Hepinstall) and the Montgomery County Department of Social Services (William L. Austin, Robert Reidy, and Rosemary Brown) for conduct occurring while RBI was in the custody of the Albany County Department of Social Services ("ACDSS"). Plaintiffs assert claims under 42 U.S.C. § 1983 contending that the defendants' actions, or inactions, deprived RBI of his right to substantive due process as guaranteed under the Fourteenth Amendment

1

to the United States Constitution, see Compl. (First Claim for Relief), and violated state common law and statutory duties that defendants owed to RBI. Id. (Second Claim for Relief). Presently before the Court are three motions for summary judgment: one by Defendants Grossi, Janet Lynch, Flynn, Burger, Barbara Lynch and Hepinstall (referred to collectively as "ACDSS Defs"); one by Defendant Fitzpatrick (Fitzpatrick);[1] and one by Defendants Austin, Reidy, and Brown (referred to collectively as the "MCDSS Defs.").[2]  Plaintiffs have separately opposed each motion.

## II. STANDARD OF REVIEW

It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, see Tenenbaum v. Williams, 193 F.3d 581, 592 (2d Cir. 1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  A party seeking summary judgment bears the burden of informing the Court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the movant is able to establish a *prima facie* basis for summary judgment, the burden of

---

[1] Even though Fitzpatrick was employed by ACDSS, she has independent counsel and has filed a separate motion for summary judgment.

[2] The MCDSS defendants moved for dismissal under Fed. R. Civ. P. 12, but submitted a Local Rule 7.1 Statement of Material Facts, affidavits, and exhibits, and refer to this material in their argument for dismissal. Plaintiffs had sufficient notice that these defendants were making Rule 56 arguments and had the opportunity to (and in fact did in certain respects) respond in kind. Therefore, the Court has determine to treat the MCDSS defendants' motion as one for summary judgment. See Fed. R. Civ. P. 12(c).

production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  While the Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in his favor, Abramson v. Pataki, 278 F.3d 93, 101 (2d Cir. 2002), a party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation. Scotto v. Almenas, 143 F.3d 105, 114 (2d. Cir. 1998). As one legal treatise has succinctly stated, summary judgment requires the parties to "put up or shut up." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000)(quoting Fleming James, Jr. & Geoffrey C. Hazard, Jr., Civil Procedure 150 (2d ed. 1977)).

      The Local Rules of the Northern District provide a mechanism for the efficient resolution of summary judgment motions. See N.D.N.Y.L.R. 7.1(a)(3).  This mechanism places the onus on the parties to marshal the evidence that either supports, or defeats, the motion. Monahan v. New York City Dep't of Corrections, 214 F.3d 275, 291 (2d Cir. 2000)(The Court's Local Rules require the parties "to clarify the elements of the substantive law which remain at issue because they turn on contested facts.").  The competing Local Rule 7.1(a)(3) statements are where the parties are to present this evidence.  Facts that are not in these statements or not supported by specific citations to the record need not be considered. See id. (The Court "is not required to consider what the parties fail to point out.")(internal quotation marks and citations omitted); Amnesty America v. Town of West Hartford, 288 F.3d 467, 470 (2d Cir. 2002)("We agree with those circuits that have held that FED. R. CIV. P. 56 does not impose an obligation on a district court to perform an independent

3

review of the record to find proof of a factual dispute.")(citations omitted). Compliance with these dictates and procedures is especially important in a case such as this where the parties have submitted several thousand pages of documents, affidavits, court orders, and the like. In addition, all of the parties have made broad, conclusory generalizations about the evidence in this case and, as can be expected, there is significant dispute about the facts of the case and the reasonable inferences that can be drawn from the evidence.

**III. BACKGROUND**

Viewing the evidence in the light most favorable to Plaintiffs and drawing all reasonable inferences in their favor, see Abramson v. Pataki, 278 F.3d 93, 101 (2d Cir. 2002), the following relevant facts are revealed by the parties' Local Rule 7.1 Statements.

On May 11, 1990, RBI was born to a 15 year old mother, Ruth B. At the time, Ruth B. was residing in a New York State Division for Youth ("DFY") facility in Onondaga County, New York. In October 1990, at age 3 ½ months, RBI was removed from Ruth B.'s legal and physical custody upon a finding by the Onondaga County Family Court[3] of inadequate guardianship/neglect on the part of Ruth B. Although there was no finding of sexual abuse by Ruth B., see ACDSS Defs. L. R. 7.1 Stat. Material Facts ("ACDSS 7.1 Stat.") ¶ 4, there is some indication that Ruth B. had sexually abused RBI. See Plaintiffs' Statement of Additional Material Facts ("Plf. SOAMF") ¶ 5; Stewart Aff., ex. H.[4] RBI was placed in the care and custody of the Onondaga County of Social

---

[3] The parties incorrectly assert that the finding was made by the Onondaga County Department of Social Services.

[4] In an evaluation of RBI conducted in November 2004 that included review of RBI's records, Jonathan M. Horowitz, M.D. noted that Ruth B.'s neglectful conduct involved "rough handling" of RBI that included inappropriate and painful manipulation of his arms, legs, penis and testicles. However, Dr. Horowitz opined that "[a] three month old infant would experience this mistreatment as painful but would not have the experience of being sexually abused."

Services for a period of one year.

In November 1990, the legal and physical custody of RBI was transferred to the Albany County Department of Social Services (ACDSS). Plf. SOAMF ¶ 10.[5] According to Onondaga County, at the time RBI was transferred into ACDSS's custody, he was a healthy child with no known special needs although, as is apparent, he had been the victim of neglect and/or abuse by his mother. Fitzpatrick L.R. 7.1 Statement of Material Facts ("Fitz. 7.1 Stat.") ¶ 3. There is also an indication that Onondaga County reported to Albany County that the birth mother had a psychiatric history and a violent nature. Plf. SOAMF ¶ 8. RBI remained in the primary custody of the ACDSS up to July 10, 1997, and "was subject to after-adoption follow-up and supervision [by ACDSS] for another three years until July 10, 2000." Compl. ¶ 19.

Once RBI came under the care of ACDSS, RBI was placed in foster care and, for approximately the first year (November 15, 1990 to November 25, 1991), Defendant Teresa Fitzpatrick served as his caseworker. Fitz. 7.1 Stat. ¶ 12. While RBI was assigned to Defendant Fitzpatrick, he was placed with two certified foster care families, the Hannays and the McElroys.[6] These families provided for RBI's basic needs, and the child, who had been seen for a developmental assessment, presented with no exceptional physical or psychological conditions during this time. Fitz. 7.1 Stat. ¶ 5-9.

In addition, the Family Court had ordered supervised visitation between Ruth B. and RBI, and Fitzpatrick conducted the supervised visitation in her role as an ACDSS employee. Fitz. 7.1 Stat

---

[5] The Onondaga County Family Court Order that removed RBI from Ruth B.'s custody required that the custody of RBI be in the department of social services of the county in which Ruth B. resided or was placed.

[6] In January of 1991, when RBI was eight months old and placed with the McElroys, Defendant Marge Flynn was also assigned as a caseworker for RBI.

5

¶ 11. Plaintiffs assert that before "extended further contact with [Ruth B.], RBI was described as a very happy baby with no notable problems." Plf. SOAMF ¶ 13. It is unclear whether the "extended further contact" that Plaintiffs complain of included the supervised visits during the first year that RBI was in ACDSS custody. The record reflects that during the supervised visitation, Ruth B. demonstrated an overall lack of interest in bonding with the child and generally deficient parent skills. See Plf. SOAMF ¶¶ 15- 18.

In April of 1991, Fitzpatrick noted in her caseworker file that she felt that if Ruth B. did not progress in her involvement with RBI by October 1991, a termination of parental of rights action should be commenced. Plf. SOAMF ¶ 20. In July 1991, RBI and Ruth B. were seen for a "family assessment." Fitz. 7.1 Stat. ¶ 9. The certified social worker conducting the assessment, Shirley Schlossberg, recommended that a parental termination proceeding be commenced. Plf. response to Fitz. 7.1 Stat. ¶ 9.

On November 25, 1991, Fitzpatrick ceased being a case worker for RBI. Fitz. 7.1 Stat. ¶ 12. From this point forward, there is no indication of any involvement between Fitzpatrick and RBI except for an incident that occurred in August of 1993. In this regard, on August 31, 1993, the ACDSS received a "hotline" call[7] that alleged that RBI had fallen down some stairs while his mother, Ruth B., was supposed to be watching him. Fitz. 7.1 Stat. ¶ 16. The question was raised whether the fall was caused by a lack of supervision on Ruth B.'s part. ACDSS officials assigned Fitzpatrick as the Child Protective Services ("CPS") caseworker to investigate the hotline call. Fitz. 7.1 Stat. ¶ 17. The caseworker notes reflect that on August 31, 1993, an ACDSS Child Protective

---

[7] New York Social Service Law § 422 establishes a statewide "central register" to receive telephone calls of child abuse and maltreatment. The statewide central register is staffed twenty four hours a day, seven days per week and is colloquially referred to as the "Child Abuse Hotline."

Services Caseworker spoke with Ruth B. regarding the allegations, but the records do not indicate which CPS caseworker actually did this investigation. Fitzpatrick Aff. ¶12. Fitzpatrick has no independent recollection of conducting it. Id. Nonetheless, the investigation was deemed "unfounded" and the official records of this event were expunged in accordance with the then-existing protocols in the State of New York. Id.

Returning to November of 1991 when Fitzpatrick ceased serving as RBI's caseworker, the ACDSS's Local Rule 7.1 Statement of Material Facts is decidedly barren regarding the events that occurred over the next several years, at least with regard to the facts material to the ACDSS's motion. See ACDSS 7.1 Stat. ¶¶ 7-28. Suffice it to say that at some point after November of 1991, the ACDSS determined to work towards reuniting Ruth B. and RBI. In this regard, after Ruth B. was released from her DFY placement, she received some type of parenting classes and began exercising progressively less restrictive visitation, working up to unsupervised over-night visitation. Plaintiffs contend that the visitation was fraught with problems and indications that RBI was not being properly cared for during visitation. See Plf. SOAMF ¶¶ 32-44. Nonetheless, in an effort to reunite the mother and child, ACDSS attempted a "trial discharge" whereby RBI was allowed to live with Ruth B. on a full time basis. Id. ¶ 45; ACDSS 7.1 Stat. ¶ 7. This trial period of custody lasted for approximately eight (8) months, from May 7, 1993 to January 11, 1994. ACDSS 7.1 Stat. ¶ 7. Although the matter is not addressed by Defendants, Plaintiffs contend that there were numerous and profound problems occurring while RBI was in Ruth B.'s physical custody, and that these problems were negatively affecting RBI's physical, emotional, and psychological well being. See Plf. SOAMF ¶¶ 49-103. Plaintiffs further contend that the ACDSS defendants were aware of these problems, yet failed to exercise their authority to remove RBI from his mother's care or otherwise

7

protect his interests.

On January 11, 1994, after a call was placed to the Child Abuse Hotline, RBI was removed from his mother's physical custody. ACDSS 7.1 Stat. ¶ 8. Upon removal, the child was examined and, based upon the numerous bruises and injuries he had sustained while in his mother's care, ACDSS determined that Ruth B. had abused and maltreated RBI. RBI was then re-placed in the McElroy foster home. ACDSS 7.1 Stat. ¶ 9. After the child returned to the McElroy foster home, it was determined that RBI was deaf so he began attending a special education pre-school at the Altamont School. In addition, based upon RBI's conduct and sexual acting out, the McElroys felt that RBI had "changed" and determined they could no longer have him reside in their home. Plf. SOAMF ¶¶ 110-113.

While at the Altamont School, RBI worked with a teacher named Sandra Benintende. Mrs. Benintende and her husband expressed an interest in becoming certified foster care parents for RBI. Although they lived in Montgomery County, the Benintendes were certified as foster parents by Albany County. ACDSS 7.1 Stat. ¶ 11. As part of the certification process, ACDSS called the Montgomery County Department of Social Services ("MCDSS") and asked that agency to conduct a home study of the Benintendes. MCDSS, through the individual MCDSS defendants, declined the request. MCDSS 7.1 Stat. ¶ 4. The individual MCDSS defendants had no involvement with the certification of the Benintendes or the placement of the child. Id.

In May of 1994, Ruth B. surrendered her parental rights. ACDSS 7.1 Stat. ¶ 10. On June 30, 1994, RBI was placed in the Benintende's foster home. Plaintiffs contend that while the child was at the Benintendes' home, he repeatedly acted in a violent and sexual manner and, after a period of two years, it was determined that RBI would be moved to a different home. See Plf. SOAMF ¶¶

114-136. In July 1996, RBI was placed in the foster home of Plaintiffs Bradley and Heidi Ingrao. ACDSS 7.1 Stat. ¶ 18. Plaintiffs contend that, despite reason to believe that RBI had been the victim of sexual abuse, "ACDSS assured [the Ingraos] that RBI was not sexually abused." Plf. SOAMF ¶¶ 137. RBI was adopted by the Ingraos in July of 1997. ACDSS 7.1 Stat. ¶ 18.

From July of 1996 until 1999, the Ingraos observed numerous inappropriate acts by RBI. Plf. SOAMF ¶¶ 137-142. He was diagnosed with post traumatic stress disorder secondary to abuse, neglect and trauma, and underwent multiple psychiatric hospitalizations. Plf. SOAMF ¶ 142. In 1999, when RBI was just shy of nine years old, the Ingraos placed him in a residential psychiatric center for the deaf specializing in severely emotionally disturbed children (the Walden School) where he has remained as a full time resident. Id. ¶ 143.

In the fall of 1999, RBI reported in therapy at the Walden School that he had been sexually abused by other minors in the Benintendes' home while the Benintendes were absent from the home. Id. The therapist called Defendant Barbara Lynch and advised of the disclosure, but Lynch advised, *inter alia*, that she could not do anything until further details were provided. Id.

In 2001, Plaintiffs commenced an action in this court against the County of Albany and the County of Montgomery that is based on the same set of facts as this case and that asserts, essentially, the same claims as are made in this case. See Ingrao v. County of Albany, 01-CV-730 (N.D.N.Y.). In 2004, Plaintiffs commenced this action against the defendants named above, asserting claims against these defendants in their individual capacities only.

**IV. DISCUSSION**

    **A. Claims against Defendants Austin, Reidy, and Brown**

Defendants William L. Austin, Robert Reidy, and Rosemary Brown move for summary

9

judgment contending that they are entitled to qualified immunity for any cognizable federal violation that they may have committed.  See MCDSS Mem. L. pp. 5. Of course, the Supreme Court has instructed that before a court reaches the issue of qualified immunity, the court must determine whether a cognizable Section 1983 claim exists. See Hope v. Pelzer, 122 S.Ct. 2508, 2513 (2002); Saucier v. Katz, 121 S.Ct. 2151, 2155-56 (2001);  Aiken v. Nixon,236 F. Supp.2d 211, 229 (N.D.N.Y. 2002), aff'd 80 Fed. Appx. 146, 2003 WL 22595837 (2d Cir. Nov. 10, 2003).  Here, the Court sees  no viable Section 1983 claim against Defendants Austin, Reidy, and Brown.  None of these defendants had any personal involvement, directly, indirectly,  or in a supervisory capacity, in any decision related to the placement, care, custody, or control of RBI, Ruth B., or anyone else who might have inflicted injury on RBI.  This lack of personal involvement is fatal to Plaintiffs' Section 1983 claims against these defendants. See Kentucky v. Graham, 473 U.S. 159, 166 (1985)(To establish personal liability against a government official for a constitutional violation, a plaintiff must show that "the official, acting under color of state law, caused the deprivation of a federal right."); McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir. 1977)("Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."), cert. denied, 434 U.S. 1087 (1978); see also Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995)(discussing supervisory personal involvement in Section 1983 actions).

  Further, even assuming that the MCDSS defendants had some duty to act under the Due Process Clause because RBI was in their custody (a proposition that this Court does not adopt), there is no evidence from which a reasonable fact finder could conclude that Defendants Austin, Reidy, or Brown acted, or declined to act, with the requisite state of mind to make out a viable substantive due process claim, or that there was any causal connection between their failure to act

and any injury sustained by RBI.  See Pena v. DePrisco, 432 F.3d 98, 112 (2d Cir. 2005)("In order to establish a violation of a right to substantive due process, a plaintiff must demonstrate not only government action but also that the government action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'") (quoting County of Sacramento v. Lewis, 523 U.S. 833, 847 n. 8, (1998));  Doe v. New York City Dep't of Soc. Servs., 649 F.2d 134, 145 (2d Cir. 1981) ("Defendants may be held liable . . . if they, or in the case of an agency, its top supervisory personnel, exhibited deliberate indifference to a known injury, a known risk, or a specific duty, and their failure to perform the duty or act to ameliorate the risk or injury was a proximate cause of plaintiff's deprivation of rights under the Constitution."); Lynn v. St. Anne Institute, 2006 WL 516796, at *5 (N.D.N.Y. March 2, 2006)(McAvoy, S.J.).   Still further, although Plaintiffs have not pled a procedural due process claim, one could not be made out in this instance because New York's child protective scheme does not create an actionable property or liberty interest. See Hilbert S. v. County of Tioga, 2005 WL 1460316, at *10 - *13 (N.D.N.Y. June 21, 2005)(McAvoy, S.J.).  Accordingly, all Section 1983 claims against  Defendants William L. Austin, Robert Reidy, and Rosemary Brown are DISMISSED.

The supplemental state law claims against these defendants must also be dismissed.  There is no evidence from which a reasonable fact finder could conclude that these defendants breached any duty owed to RBI, or, if they did breach a duty,  that any breach was the proximate cause of any alleged injuries to RBI.  See Bartels v. County of Westchester, 429 N.Y.S. 2d 906, 909 (2d Dept. 1980).  Therefore, the state law claims against  Defendants William L. Austin, Robert Reidy, and Rosemary Brown are DISMISSED.

### B. Claims against Defendant Fitzpatrick

The claims against Defendant Fitzpatrick must also be dismissed. Plaintiffs seemingly contend that Fitzpatrick violated RBI's substantive due process rights because she failed to move for termination of Ruth B.'s parental rights. See Pl. Sur-Reply Mem. L. p. 2. As Defendant points out, however, there is no authority for the proposition that a caseworker has the obligation to move to terminate parental rights. Indeed, it is doubtful whether an individual caseworker, as opposed to the agency for which she works, is entitled to commence a parental termination proceeding. See N.Y. Soc. Serv. Law 384-b(3)(b).[8] To the extent that the substantive due process claim is based upon Fitzpatrick's failure to otherwise stop the contact between Ruth B. and RBI, the claim is also deficient. The uncontested facts indicate that Fitzpatrick supervised visitation between RBI and Ruth B. because a court ordered the visitation. If Fitzpatrick could not have commenced a parental termination proceeding of her own accord or otherwise stopped the visitation, then the Court fails to see how there could be the requisite causation between RBI's injuries and Fitzpatrick's failing to act in this regard. See e.g. Deters v. Lafuente, 368 F.3d 185, 189 (2d Cir. 2004).[9]

Further, and assuming that Fitzpatrick could have commenced a parental termination action or suspended court ordered visitation (or at least put such action in motion), the Plaintiffs fail to present proof from which a reasonable fact finder could conclude that Fitzpatrick acted, or failed to

---

[8] If Plaintiffs are arguing that RBI suffered injury because ACDSS - an authorized agency - failed to commence a parental termination proceeding, then the claim should be made in the case against Albany County in Ingrao v. Albany County, 01-CV-730.

[9] In Deters, the Plaintiffs, two police officers, claimed, *inter alia*, that the Police Chief retaliated against them by creating a hostile work environment. In addressing whether there existed proof of the Chief's intent to discriminate, the Circuit held that "intent is not an issue where, as here, defendants had no authority to act. [The Mayor's] and [the Police Chief's] lack of authority means that they could not have retaliated against the plaintiffs in the manner complained of, and plaintiffs have pointed to no other evidence of retaliation."

act, with the requisite mental state to make out a viable substantive due process claim. See Pena, 432 F.3d at 112; Doe, 649 F.2d at 145; Lynn, 2006 WL 516796, at *5. There is no evidence that Fitzpatrick disregarded a known risk to the child, made a discretionary decision that allowed Ruth B. contact with RBI, allowed more contact than the court order required, hid what she observed during the visitation, or allowed Ruth B. to injure the child during visitation. Despite Plaintiffs' broad conclusory allegations to the contrary, there is no evidence from which a reasonable fact finder could conclude that the child suffered any injury because of Fitzpatrick's actions, or inactions, or that she displayed deliberate indifference to the child's well being during the period of time that she served as his case worker or from the response to the July 1993 hotline call.

To the extent that Plaintiffs' Section 1983 claim against Fitzpatrick is based on a procedural due process violation, the claim fails because the discretionary aspects of parental termination proceedings and child protective actions in New York fail to create actionable property or liberty interests. See Hilbert S., 2005 WL 1460316, at *10 - *13.

Still further, even if Fitzpatrick had the power to commence a parental termination proceeding or otherwise interfere with visitation, the dictates of New York law in effect at the time generally required that diligent efforts be made to assist, develop and encourage a meaningful relationship between parent and child, including insuring visitation. See In re Marino S., Jr., 100 N.Y.2d 361, 368-69 (2003).[10] Thus, it cannot be said that Fitzpatrick acted objectively

---

[10] In Marino S., the New York Court of Appeals discussed the state of New York law before New York passed the Adoption and Safe Families Act in 1999. In this regard, the Court noted:

> As a rule, when a child has been removed from the home based on alleged abuse or neglect--as these three children were--the social services official responsible for the child must attempt to reunite the child with the birth parent; this includes efforts at rehabilitation so as to render the parent capable of caring for the child (see Family Ct Act § 1052 [b] [i] [A]; § 1055 [c]). Such efforts typically include

(continued...)

unreasonably under the law in existence at the time by failing to move for parental termination or preventing visitation. Therefore, and in the alternative, she is entitled to qualified immunity for any conceivable constitutional violation that arises from her alleged failure to act in this case. Accordingly, all Section 1983 claims asserted against Teresa M. Fitzpatrick are DISMISSED.

The state law claims against Teresa M. Fitzpatrick are also DISMISSED because Plaintiffs failed to identify any claims against this defendant in the Notice of Claim served on the County of Albany. See Moore v. Melskey, 14 A.D.3d 757, 759 (3rd Dept. 2005).[11]

### C. Claims against Defs. Grossi, Janet Lynch, Flynn, Burger, Barbara Lynch and Hepinstall

Defendants Grossi, Janet Lynch, Flynn, Burger, Barbara Lynch and Hepinstall first move to dismiss the claims against them on the grounds that there is a duplicative action pending. While the

---

[10](...continued)
facilitation of parent-child visits and provision of services to the parent, including assistance with housing, employment, counseling, medical care and psychiatric treatment (see Family Ct Act § 1055 [c]).

Similarly, in termination of parental rights proceedings (governed by Social Services Law § 384-b) a foster care agency generally must demonstrate that diligent efforts at reunification have been undertaken. Such efforts are not required, however, where they would be detrimental to the best interests of the child (see Social Services Law § 384-b [8] [a] [iv]). These provisions implement New York's strong public policy of both keeping families together and protecting the health and safety of children (see Social Services Law § 384- b [1]).

100 N.Y.2d at 368-69.

[11] In Moore, the 3rd Department wrote:

In both its caption and its text, however, the notice identified only plaintiff individually as the claimant ... and only DSS and the County as the parties against whom the claim was being made. . . . In light of the notice's specification of parties here, and since corrections of a substantive nature are beyond the scope of the discretion conferred by General Municipal Law § 50-e (6), we find that Supreme Court did not err in dismissing the child's claims against DSS and the County as well as all claims against the individual defendants to the extent that they were acting within the scope of their employment.

14 A.D.3d at 759 (citations omitted).

14

claims in Ingrao v. County of Albany, 01-CV-730, arise from the same events and circumstances that form the basis for the instant action, and while the claims asserted in the two cases are nearly identical, the two cases are not duplicative. Defendants Grossi, Janet Lynch, Flynn, Burger, Barbara Lynch and Hepinstall are not named in the earlier case, and the County of Albany is not named in the instant case. Thus, to the extent the motion is based upon this argument, it is DENIED.

Next, Defendants Grossi, Janet Lynch, Flynn, Burger, Barbara Lynch and Hepinstall argue that they are entitled to qualified immunity on all Section 1983 claims brought against them. The problem with the argument is that, based upon these Defendants' Local Rule 7.1 Statement of Material Facts, it is virtually impossible to decipher what specific role each played during the relevant period that RBI was in the custody of the ACDSS. Thus, it is nearly impossible to determine (1) whether any of these defendants violated RBI's constitutional rights, and (2) if they did, whether they are entitled to qualified immunity.

While the evidence that might shed some light on these questions is probably contained within the mountain of documents submitted in this case, the Court declines to weed through the evidence to try to find what the parties have failed to point out. In light of this, the Court could simply determine that these defendants have failed to meet their *prima facie* burden on summary judgment, deny the motion, and send the case on for trial. See also N.D.N.Y.L.R. 7.1(a)(3) ("Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion.")(emphasis in original). However, such a such a procedure would serve neither the "salutary purposes of summary judgment--avoiding protracted, expensive and harassing trials," Nicastro v. Runyon, 60 F. Supp.2d 181, 183 (S.D.N.Y. 1999), nor the public policy behind early resolution of qualified immunity defenses. See Aiken v. Nixon, 236 F. Supp.2d 211, 229 (N.D.N.Y.

2002),[12] aff'd 80 Fed. Appx. 146, 2003 WL 22595837 (2d Cir. Nov. 10, 2003). Therefore, the Court will exercise its discretion and deny summary judgment to these Defendants but grant them leave to renew their motion for summary judgment upon proper papers.

## IV. CONCLUSION

Based on the above,

(1) Defendants Claudette M. Grossi, Janet Lynch, Margaret Flynn, Andrea Burger, Barbara M. Lynch and Jo Hepinstall's motion for summary judgment [dkt. # 31] is **DENIED**, and these defendants are **granted leave to renew** their summary judgment motion, within sixty (60) days of this Decision and Order, upon proper papers. In this regard, Defendants should marshal in their Local Rule 7.1 Statement all facts that they contend support their entitlement to summary judgment, and in doing so, should provide specific citations to the record in this case where support for such facts can be found. Plaintiffs should perform accordingly in responding;

(2) Defendants William L. Austin, Robert Reidy, and Rosemary Brown's motion for summary judgment [dkt. # 32] is **GRANTED** and all claims against them are **DISMISSED**;

(3) Defendant Teresa M. Fitzpatrick's motion for summary judgment [dkt. # 33] is **GRANTED** and all claims against her are **DISMISSED**.

---

[12] In Aiken, the Court noted:

> The [qualified immunity] defense "serves important interests in our political system," Sound Aircraft Servs., Inc. v. Town of East Hampton, 192 F.3d 329, 334 (2d Cir. 1999), ensuring that damages suits do not "unduly inhibit officials in the discharge of their duties" by burdening individual officers with "personal monetary liability and harassing litigation." Anderson v. Creighton, 483 U.S. 635, 638 (1987); see Connell v. Signoracci, 153 F.3d 74, 79 (2d Cir. 1998). For this reason, the Supreme Court has directed that "[w]here the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive." Saucier v. Katz, 121 S.Ct. 2151, 2155-56 (2001).

236 F. Supp.2d at 229.

**IT IS SO ORDERED**

DATED: March 31, 2006

Thomas J. McAvoy
Senior, U.S. District Judge